IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHERIDA FELDERS, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>BRIAN BAIRETT,<br><br>                    Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No. 2:08-cv-0993 CW<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

Trooper Brian Bairett stopped plaintiff Sherida Felders for speeding on I-15 near Cedar City, Utah. After issuing her a traffic citation, Trooper Bairett continued questioning Ms. Felders and her two passengers and then detained them to conduct a canine sniff of her vehicle. Thirty minutes after Trooper Bairett called for a K-9 unit, Deputy Jeff Malcom arrived at the scene with Duke, a dog trained to detect narcotics. Duke allegedly alerted to the smell of narcotics. Consequently, Trooper Bairett, Deputy Malcom, and another officer conducted a thorough search of the vehicle, but found no drugs or other contraband.

Ms. Felders and her two passengers now advance three causes of action: first, an unlawful seizure claim under the Fourth Amendment against Trooper Bairett; second, an unlawful search claim under the Fourth Amendment against Trooper Bairett and Deputy Malcom; and third, a unlawful racial profiling claim under the Equal Protection Clause of the Fourteenth Amendment against Trooper Bairett. Ms. Felders, Trooper Bairett, and Deputy Malcom all move for summary

judgment.

For the reasons discussed below, the court grants summary judgment in favor of Trooper Bairett on the plaintiffs' claims for unlawful seizure and racial profiling.  With respect to the claim against Trooper Bairett for unlawful search, the court concludes that Trooper Bairett facilitated Duke's entry into the vehicle.  Consequently, if Duke did not alert prior to entering the vehicle, Trooper Bairett violated the plaintiffs' constitutional right to be free from unreasonable search.  A material fact is in dispute, however, as to whether Duke alerted and whether Deputy Malcom handled him properly during the search.  Accordingly, the court denies both the plaintiffs and the defendants' motions for summary judgment on this cause of action.

## FACTUAL BACKGROUND

On November 20, 2008, Ms. Felders, a fifty-four year old, African-American woman, was pulled over for speeding on I-15 near Cedar City, Utah by Trooper Bairett.  Ms. Felders was traveling with two passengers, Elijah Madyun, who was seventeen years old, and Delarryon Hansend, who was eighteen years old. The plaintiffs do not dispute that Trooper Bairett had reasonable cause to initiate the traffic stop due to the speed at which Ms. Felders was traveling.  The subsequent stop, detention, and search were captured by Trooper Bairett's dashboard video camera.

After Ms. Felders pulled to the side of the highway, Trooper Bairett requested, and Ms. Felders provided, her driver's license and vehicle registration.  She did not have a copy of her insurance card.  During this initial contact, Trooper Bairett alleges that he observed the plaintiffs were very nervous and that Ms. Felders would not maintain eye contact with him.  He also observed that an air freshener was emitting a strong odor from inside the vehicle and that the vehicle had a

license plate ring with "Jesus" written on it.  Trooper Bairett asked Ms. Felders several questions, including the purpose of her trip, and her reason for driving over the speed limit.  Trooper Bairett then returned to his vehicle with Ms. Felders' documents.  Trooper Bairett did not run any computer checks while in his patrol car at that point in time.  Brian Joseph Bairett Deposition, 35:20–36:5, 44:6–9, 54:13–55:8, 56:11–22 (Dkt. No. 86, Ex. 2) (hereinafter "Bairett Depo.,).

Approximately four minutes later, Trooper Bairett approached Ms. Felders' vehicle again and asked that she step out of it so he could explain the citation.  Trooper Bairett does not routinely ask people to step out of their vehicles.  Bairett Depo., 59:8–21.  He did so in this case, however, to further question Ms. Felders because he suspected that the plaintiffs were involved in criminal activity based on their nervousness, the air freshener, and the Jesus license plate ring.  *Id.* at 51:9–17, 60:16–18.  At that point, his suspicion was not specific about any crime; rather, it was just a hunch he wanted to pursue.  *Id.* at 70:7–14.

When Ms. Felders complied with Trooper Bairett's request, he first explained the citation to her.  Then, while she was signing the citation, he started asking his additional questions about her travel plans.  Even after Ms. Felders signed the citation and gave it back to Trooper Bairett, he continued holding her driver's license and vehicle registration while he continued questioning her.[1] About twenty-five seconds later, Trooper Bairett handed Ms. Felders her license and registration. The questioning continued and Ms. Felders also asked Trooper Bairett a couple of questions to which he responded.  During this exchange, Trooper Bairett alleges that Ms. Felders repeatedly

---

[1] Trooper Bairett acknowledged in his deposition that his questioning at that point exceeded the scope of the stop.  Bairett Depo., 154:10–155:3.

stretched, rubbed her face, covered her mouth, avoided eye contact and moved away from him. Nevertheless, Trooper Bairett "was still just investigating to find out whether there was a crime," and had no articulable reasonable suspicion. Bairett Depo., 85:17–86:3.

After conversing with Ms. Felders for about a minute, Trooper Bairett asked if he could talk with her passengers. She consented. Trooper Bairett then spoke with Ms. Felders' passengers for approximately one and a half minutes before returning to question Ms. Felders further because he had noted inconsistencies in the plaintiffs' statements. Specifically, (1) Ms. Felders said her passengers were friends of her grandchildren, while the passengers said they were her cousins, (2) Ms. Felders said her grandchildren were flying to Colorado, but later said they lived there; and (3) Ms. Felders said they were returning on December 1st, but her passengers said they were returning on Sunday, which Trooper Bairett took to mean Sunday, November 23rd.[2]

When Ms. Felders attempted to explain to Trooper Bairett how there was an explanation for the inconsistencies, Trooper Bairett told Ms. Felders her story did not make sense. At that point, he believed he had sufficient reasonable suspicion that Ms. Felders was transporting drugs. Bairett Depo., 106:3–107:3. Consequently, he asked if she had any cocaine in her vehicle. Ms. Felders gave no response for approximately seven seconds. When Trooper Bairett asked her again, she said "no." Trooper Bairett continued questioning her about the presence of other types of drugs, and Ms.

---

[2] According to the deposition of Mr. Madyun, he told Trooper Bairett that they were going to Colorado for Thanksgiving. ElijahJuan Madyun Deposition, 29:18–19 (Dkt. No. 93, Ex. 1). The dash cam audio is not sufficiently clear to resolve what Mr. Madyun's response to this question was. If he said they were going for Thanksgiving, "Sunday" could not have meant November 23rd. Instead, it would be in keeping with Ms. Felders' stated date of return, namely, December 1st. A factual dispute therefore exists about whether this stated inconsistency was present.

Felders continued to deny she had any drugs in the vehicle.  Finally, Trooper Bairett asked if he could search her vehicle.  Ms. Felders said, "No.  No, you can't search my car."  Transcript of Dash Cam Video, 15:23–24 (hereinafter "Video Tr.").  In response, Trooper Bairett informed Ms. Felders he was detaining her until a K-9 unit arrived to do a sniff of her vehicle.

Some difficulty ensued in locating a K-9 unit.  During that delay, Trooper Bairett called his sergeant, Ryan Bauer, and reported the details of the stop and what he had observed.  *See* Bairett Depo., 88:16–23; Summary Report of Sgt. Ryan Bauer, 2 (Dkt. No. 86, Ex. 6) (reporting that Trooper Bairett had contacted him during the stop for advice).  He also told his sergeant, "If I can't get a dog, I'll just have to let her go."  Video Tr., 23:8.  Following a prompting from his sergeant, Trooper Bairett ran three computer checks on Ms. Felders for the first time.  Dispatch reported back that Ms. Felders previously had "one charge of receiving stolen property and battery on a police officer with a firearm."[3]  Video Tr., 23:22–24.  No prior drug charges or convictions were found.

While Trooper Bairett was waiting for a K-9 unit to arrive, Deputy Wade Lee appeared at the scene.  Trooper Bairett rehearsed for that officer all that had occurred during the stop.  Trooper Bairett then stated, "There's so much—I'm to the point right now where it's probable cause to get in that vehicle, whether she likes it or not."  Video Tr., 30:25–31:2.  The officers further discussed Ms. Felders' refusal to consent to the search.  Both expressed that when a person refuses consent, it is because "[t]here's something in there."  Video Tr., 33:19–34:4.  Otherwise, Deputy Lee opined, "most people think it's fun" to have an officer search their vehicle and so they consent.  *Id.* at

---

[3]  It was later learned the information conveyed by Dispatch was incorrect.  Ms. Felders' criminal history showed no charge for a firearm.  Instead, "it stated, 'battery on a peace officer/*fireman*.'"  Internal Affairs Report, 7 (Dkt. No. 86, Ex. 5) (emphasis in original).

33:19–21.  Trooper Bairett concurred.  *Id.* at 33:22–25 (stating in response, "I know.  Most of the people would be, 'Yeah, go ahead.'  If there's nothing going on they're like, 'Yeah, knock yourself out.'").

Eventually, Dispatch informed Trooper Bairett that Deputy Malcom would be reporting with his drug dog, "Duke."  Upon learning this information, Trooper Bairett asked Deputy Lee, "Will Duke jump up in through windows? . . . Because the windows are open."  Video Tr., 32:18–25.

When Deputy Malcom did arrive, approximately thirty minutes had elapsed from the time Trooper Bairett had first called for a K-9 unit.  Trooper Bairett took the next two minutes to detail for Deputy Malcom what had occurred during the stop.  He then concluded, "I basically—to me, I've got probable cause to search the vehicle without her permission or not, so I figured the dog would be the best route to go right now."  Video Tr., 43:24–44:2.  Next, Deputy Malcom told Trooper Bairett to remove the two passengers from the vehicle.  Trooper Bairett responded, "Yeah, that's what I was planning on doing.  When they get out of the car, I'll leave the doors open."  Video Tr., 44:16–18.

Despite this express statement, Trooper Bairett stated in his report that the passengers left the doors open.  Incident Report, 5 (Dkt. No. 86, Ex. 4).  He also stated in his deposition that he did not leave the doors open.  Bairett Depo., 117:10–20.  The videotape shows, however, that as Mr. Madyun exited through the front passenger door, Trooper Bairett put his hand on the door and opened it wider.  Dash Cam Video, 9:44:58–9:45:00.  Next, it shows that Trooper Bairett stepped towards the rear passenger door when it opened.  As Mr. Hansend exited, he moved to close the door.  Trooper Bairett, however, put his hand on the door to stop it from being closed.  Dash Cam

Video, 9:45:00.  Ms. Felders was then directed to remove her Chihuahua from the back of the vehicle.  She lifted the back window hatch to do so and left that open.  Consequently, the back hatch and front and rear passenger doors were all open when Duke was deployed.

Duke first went to the back hatch, lifted his head up, and sniffed at the open window; but Deputy Malcom appeared then to pull on Duke's leash briefly to guide him away from the back of the vehicle.  *Id.* at 9:47:38–9:47:42.  Deputy Malcom next backed towards the rear passenger door that was open, keeping Duke between him and the vehicle.  *Id.* at 9:47:42–44.  Upon arriving at the passenger door, Duke jumped into the vehicle.  *Id.* at 9:47:44–9:47:45.  The total time from deployment until Duke entered the vehicle was seven seconds.  In those seven seconds, Duke spent about four seconds approaching the back hatch window and sniffing it.  Deputy Malcom testified at his deposition that Duke did not alert during that time.  Deposition Jeffrey C. Malcom, 63:18–20 (Dkt. No. 123, Ex. 2) (hereinafter "Malcom Depo.").  In the next three seconds, however, Deputy Malcom attested that Duke did alert because Duke "began breathing quickly and deeply, which is how he acts when he alerts to a drug odor."  Aff'd of Jeff Malcom, ¶ 21 (Jan. 14, 2011) (Dkt. No. 115).  Additionally, he jumped into the vehicle, and when he entered the vehicle that constituted part of his alert.  *Id.*; Malcom Depo., 87:4–7.

Malcom also provided an affidavit from an expert witness, Wendell Nope, to support that Malcom acted appropriately in handling his dog.  Mr. Nope is "the K-9 Training Supervisor at the Peace Officer Standards and Training Division (POST) of the Utah Department of Public Safety."  Affidavit of Wendall Nope, ¶ 7 (Dkt. No. 129).  He also has authored some of the service dog training manuals.  *Id.* ¶ 6.  Mr. Nope attested that he reviewed the dash cam video, and based on his

expertise, it was evident to him that Duke "alerted when he lifted his head up, began breathing deeply, and jumped into the rear passenger door of the Jeep." *Id.* ¶ 23.

Duke's first entry into the vehicle lasted approximately two minutes. Deputy Malcom then removed him from the vehicle, but allowed him to re-enter two more times. After searching the vehicle for approximately five minutes, Duke indicated by sitting and focusing intently by the driver's side door. The three officers then spent almost an hour searching the vehicle and its contents, including removing paneling to search behind it. They found no illegal drugs or other contraband; and therefore, had to end the plaintiffs' detention. The entire stop lasted approximately two hours.

## ANALYSIS

## I.    STANDARD OF REVIEW

### A.    Summary Judgment Standard

"Summary judgment should be rendered if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sabourin v. Univ. of Utah*, 676 F.3d 950, 957 (10th Cir. 2012) (quotations and citation omitted); *see also* Fed. R. Civ. P. 56(a). When a non-movant bears the burden of proof on an issue, it "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to its case." *Mt. Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) (quotations, citation, and alteration omitted). If a nonmovant fails to do so, it cannot survive a motion for summary judgment on that issue. *Id.* The court views evidence "in the light most favorable to the

non-moving party." *Sabourin*, 676 F.3d at 957 (quotations and citation omitted). Nevertheless, because a videotape is present in this case, the court should view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381–82 (2007).

### B.     Qualified Immunity Standard

Trooper Bairett and Deputy Malcom both contend that the plaintiffs' claims are barred by qualified immunity. "Qualified immunity shields government officials from liability for civil damages" as long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Romero v. Story*, 672 F.3d 880, 882 (10th Cir. 2012) (quotations and citation omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (quotations and citations omitted). Here, the plaintiffs allege constitutional violations based on unreasonable search and seizure and racial profiling.

## II.     REASONABLENESS OF THE SEIZURE

### A.     Scope of Detention

"Before initiating a stop of a vehicle, an officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred." *United States v. Barraza-Martinez*, 364 Fed. Appx. 453, 457 (10th Cir. 2010) (quotations and citation omitted). The plaintiffs do not dispute that Trooper Bairett lawfully stopped them because Ms. Felders was speeding.

During a valid stop, an officer "may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate."

*United States v. Kitchell*, 653 F.3d 1206, 1217 (10th Cir. 2011) (quotations and citation omitted). Additionally, "an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." *Id.* (quotations and citation omitted). This includes asking brief questions about a motorist's travel plans. *Id.* at 1219 (citation omitted). The detention, however, generally may "last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 1217 (quotations and citation omitted). If a stop "is prolonged beyond the time reasonably required to complete" its purpose, it can become unlawful. *United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011). Consequently, when the purpose of the stop is completed, typically a driver must "be allowed to proceed on his way without further delay by the law enforcement officer for additional questioning." *United States v. Wisniewski*, 192 Fed. Appx. 749, 754 (10th Cir. 2006) (citations omitted).

There are two exceptions to this rule. First, if an "officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity," the officer may extend the stop. *Davis*, 636 F.3d at 1290 (quotations and citation omitted). Second, if an "initial detention becomes a consensual encounter," the stop may continue. *Id.* (quotations and citation omitted). Here, Trooper Bairett contends Ms. Felders initially consented to the additional questioning, and that by the time he asked to search her vehicle, he had a reasonable suspicion of criminal activity that permitted him to further detain the plaintiffs.

## B. Consensual Encounter

The Tenth Circuit "follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to [him]." *United*

*States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308–09 (10th Cir. 2006) (quotations, citations, and alteration omitted).  After one's documents have been returned, courts look at whether "the driver . . . has an objective reason to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way."  *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994) (quotations and citation omitted).

Here, Trooper Bairett asked Ms. Felders to step out of her vehicle for the express purpose of continuing to question her.  At that point, Trooper Bairett had observed an air freshener, a Jesus license plate ring, and nervousness.  These factors fall far short of reasonable suspicion of criminal activity.[4]  Thus, Trooper Bairett is correct that Ms. Felders' continued detention had to be consensual.

The dash cam video shows that while Ms. Felders was signing the citation, Trooper Bairett started his additional questioning.  He then held on to Ms. Felders' documents for twenty-five seconds after the citation had been signed and handed back to him.  While this may constitute an unlawful detention in certain circumstances, and the court is not without some concern here, it nevertheless concludes the particular questions and interaction between Trooper Bairett and Ms. Felders do not rise to the level of an unreasonable detention.  Any detention up to this point was de minimus.  Moreover, it is clear that Ms. Felders gave consent for Trooper Bairett to question her passengers.

---

[4]  At one point in his deposition, Trooper Bairett stated he did have reasonable suspicion to detain Ms. Felders when he asked her to step out of her vehicle.  Bairett Depo., 149:2–150:2.  This statement appears to stem from a lack of preciseness about the difference between a mere suspicion or a hunch and the legal phrase "reasonable suspicion."  Even if Trooper Bairett did actually believe the legal standard had been met, that conclusion would have been erroneous.

C.     Reasonable Suspicion

When Trooper Bairett concluded his questioning, he asked Ms. Felders whether he could search her vehicle.  She stated unequivocally that he could not search it.  Because Ms. Felders ended the consensual encounter, Trooper Bairett had to have reasonable suspicion to continue detaining the plaintiffs.

"In determining whether reasonable suspicion exists, we look to the totality of the circumstances, rather than assessing each factor or piece of evidence in isolation." *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012) (quotations and citation omitted).  Reasonable suspicion requires an officer to "'have a particularized and objective basis for suspecting the particular person'" is engaged in criminal activity.  *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1206 (10th Cir. 2008) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).  An officer may draw on his experience and training "to make inferences from and deductions about the cumulative information available."  *Id.* (quotations and citation omitted).  Moreover, an officer is entitled to qualified immunity if he reasonably could believe that the reasonable suspicion standard had been met.  *Id.* at 1207 (citation omitted).  Nevertheless, the standard "does demand something more than an inchoate and unparticularized suspicion or hunch."  *Romero*, 672 F.3d at 886 (quotations and citation omitted).

In this case, Trooper Bairett asserts the following factors established reasonable suspicion: nervousness; a strong smelling air freshener; a Jesus license plate ring; inconsistencies between what Ms. Felders said and what her passengers said; and Ms. Felders' delayed response when he asked her about drugs in the vehicle.  *See* Internal Affairs Report, 6 (Dkt. No. 86, Ex. 5).

-12-

On repeated occasion, the Tenth Circuit has stated that "religious iconography, . . . without some convincing additional factual predicate (such as the affiliation of certain gangs with particular religious symbols)," cannot "contribute anything of value suggesting illegal activity as opposed to honest devotion." *United States v. Olivares-Campos*, 276 Fed. Appx. 816, 823 (10th Cir. 2008) (citing *United States v. Guerrero*, 472 F.3d 784, 788 (10th Cir. 2007)).  Trooper Bairett has offered no evidence to show an additional factual predicate existed in this case.  It was therefore inappropriate for him to rely upon this factor in his analysis.

In contrast, the Tenth Circuit has held that the presence of air fresheners "can suggest an intent to mask the scent of concealed drugs." *United States v. Leyva*, 442 Fed. Appx. 376, 379 (10th Cir. 2011) (citation omitted).  Nervousness also may be considered, but it is a marginal factor because "nervousness is a common and natural reaction to an interaction with a police officer, whether one is innocent or guilty." *United States v. Kitchell*, 653 F.3d 1206, 1220 (10th Cir. 2011) (citation omitted).  Thus, "unless an individual's display of nervousness is unusually severe or persistent, or accompanied by other, more probative grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists." *Id.* (quotations and citation omitted).  Based on the dash cam video, it does not appear that Ms. Felders' nervousness was unusually severe or persistent.  Her nervousness, though, was coupled with other factors.

In particular, Trooper Bairett noted inconsistencies in the plaintiffs' stated relationships and travel plans.  While part of the inconsistencies may have arisen due to cultural differences and

miscommunication between the parties,[5] "lies, evasions, or inconsistencies about any subject while being detained may contribute to reasonable suspicion."  *United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010).  Additionally, when Trooper Bairett questioned Ms. Felders about carrying drugs, there was a noticeable delay in her response.  Viewing these factors under the totality of the circumstances, the court concludes Trooper Bairett had reasonable suspicion to continue to detain the plaintiffs.  Thus, the plaintiffs were not seized in violation of the Fourth Amendment, and the court grants summary judgment in favor of Trooper Bairett on this claim.[6]

## III.   REASONABLENESS OF THE SEARCH

### A.   Trooper Bairett

Although Trooper Bairett had reasonable suspicion to detain the plaintiffs until a K-9 unit arrived, Ms. Felders' vehicle could not be searched absent probable cause.  *See United States v.*

---

[5]  For example, Trooper Bairett testified the passengers said they were returning on Sunday, November 23rd.  A review of the dash cam video does not support this assertion.  Rather than expressly clarifying which Sunday they were returning, Trooper Bairett assumed that "returning in a few days" meant November 23rd.  More careful questioning may have averted the perceived "lies" and inconsistent stories.

[6]  Despite this ruling, it is troubling that Trooper Bairett and Deputy Lee both expressed the opinion that when a person denies consent to search a vehicle, it must mean they are carrying something illegal.  When one exercises a *constitutional right*, it "cannot form any part of the basis of reasonable suspicion."  *United States v. Lloyd*, 46 Fed. Appx. 912, 916 (10th Cir. 2002) (quotations and citation omitted); *see also United States v. Hunnicutt*, 135 F.3d 1345, 1350–51 (10th Cir. 1998) (same) (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Florida v. Royer*, 460 U.S. 491, 498; *Brown v. Texas*, 443 U.S. 47, 51–52 (1979); *United States v. Manuel*, 992 F.2d 272, 274 (10th Cir. 1993)).  That two officers would opine to the contrary and believe that people actually enjoy being detained and having their vehicles and belongings searched makes the court question the training and judgment of these officers.  These opinions, however, were stated after reasonable suspicion had already been established.  Thus, they do not factor into the court's reasonable suspicion analysis.

*Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011) (questioning when a "trooper gained probable cause to permit his search of the car").  "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012) (quotations and citation omitted). Although probable cause is needed to search the interior of a vehicle, probable cause is not needed to conduct a canine sniff of the vehicle's exterior because the sniff is minimally intrusive and not unreasonable.  *United States v. Ayala*, 446 Fed. Appx. 78, 80 (10th Cir. 2011) (citation omitted). If a certified drug dog gives a positive alert, this typically "provides probable cause for officers to search a vehicle."  *Id.* (citation omitted).  Notably, however, "[o]fficers may not . . . rely on a dog's alert if they open part of the vehicle so the dog can enter or if they encourage the dog to enter."  *Id.* (citations omitted).

Here, Trooper Bairett showed an express intent to facilitate Duke's entry into the vehicle. He asked Deputy Lee whether Duke could enter in through an open window, he said he would leave the doors open when he removed the passengers, and the dash cam video shows Trooper Bairett opened one passenger door wider and precluded the other passenger door from being closed. Trooper Bairett nevertheless argues that he could not have facilitated Duke's entry into the vehicle because he was not the dog handler.  Hence, he could not know how Duke would act and he had no control over him entering the vehicle.  Facilitation, however, can occur by means other than directly handling the dog.

In *United States v. Winningham*, 140 F.3d 1328, 1329 (10th Cir. 1998), an agent was granted permission to search a van for illegal immigrants.  After opening the door and finding no one inside,

-15-

he left the door open.  Subsequently, he called for a K-9 unit to check for the presence of narcotics.
As the dog handler deployed the dog to sniff the van's exterior, the handler took him off leash.
"When the dog reached the open door, he jumped into the van" and eventually alerted.  *Id.* at 1330.
Although the dog handler had not opened the door, the court nevertheless found that the dog's entry
into the vehicle had been facilitated by the other officer leaving the door open.  *Id.* at 1331 & n.2.
Consequently, even though Trooper Bairett was not the dog handler, he still can be culpable for
facilitating Duke's entry into the vehicle.

Based on the evidence, Trooper Bairett is not entitled to qualified immunity on the plaintiffs'
claim of improper search.  Indeed, from the dash cam video, it is evident that Trooper Bairett
intentionally facilitated Duke's entry into the vehicle and no reasonable fact finder could conclude
otherwise.  Thus, if probable cause was not established before Duke entered the vehicle, Trooper
Bairett violated the plaintiffs' constitutional right to be free from unreasonable search.  As discussed
below, a material issue of fact exists as to whether Duke alerted before entering the vehicle.
Whether Trooper Bairett violated the plaintiffs' constitutional right cannot therefore be resolved on
summary judgment.

### B.    Deputy Malcom

Deputy Malcom asserts he is entitled to qualified immunity because (1) he relied on the
collective knowledge doctrine; (2) his own observations supported probable cause;  (3) he has a good
faith defense; (4) he did not facilitate Duke's entry into the vehicle; and (5) Duke alerted before
entering the vehicle; thus establishing probable cause for Duke to enter the vehicle.

i.     _Vertical Collective Knowledge Doctrine_

Trooper Bairett told Deputy Malcom, "basically—to me, I've got probable cause to search the vehicle without her permission or not." Deputy Malcom contends that granted him authority to search the interior of the vehicle because he reasonably relied on Trooper Bairett's assertion of probable cause. The court disagrees.

The collective knowledge doctrine has both vertical and horizontal application. The analysis varies depending on which application is used. In this case, Deputy Malcom asserts immunity based on vertical collective knowledge. Under this application, "when an officer _having_ probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action," the knowledge of the first officer is imputed to the second officer. _Whitley_, 680 F.3d at 1234 (emphasis added). Notably, the second officer is justified only to the extent the first officer actually had the probable cause or reasonable suspicion asserted. _See United States v. Chavez_, 534 F.3d 1338, 1345–46 (10th Cir. 2008).

Trooper Bairett did not have probable cause to search the vehicle. As noted above, the evidence Trooper Bairett relied upon to detain the plaintiffs was partly improper, partly weak, and partly due to miscommunication. While it may have been sufficient to support reasonable suspicion, it did not rise to the level of establishing a fair probability that the vehicle contained contraband.

It also bears noting that Trooper Bairett told his supervisor he would have to let the plaintiffs go if he could not get a K-9 unit to respond. If he actually had probable cause, he would not have needed to call a K-9 unit and he would not have needed to let the plaintiffs go without searching the vehicle. Moreover, after Trooper Bairett had outlined all of the facts for his supervisor, at no point

did his supervisor indicate there was probable cause.  Instead, his supervisor merely said "if he feels he has enough suspicion, then he can wait for a drug dog and allow it to perform a sniff of the violator's vehicle."  Summary Report of Sgt. Ryan Bauer, 2 (Dkt. No. 86, Ex. 6).  These facts further support that probable cause was lacking.  Additionally, Trooper Bairett spent about two minutes detailing the evidence for Deputy Malcom.  Based on the evidence presented, Deputy Malcom could have formed his own conclusion that probable cause was lacking.  The court therefore concludes that vertical collective knowledge doctrine is inapplicable.

ii.    _Deputy Malcom's Own Observation_

Deputy Malcom also asserts that his own observations established "probable cause and/or reasonable suspicion to perform a dog sniff."  Aff'd of Jeff Malcom, ¶ 17 (Jan. 14, 2011) (Dkt. No. 115).  Deputy Malcom's liability, however, does not turn on whether there was reasonable suspicion to justify a dog sniff.  It turns on whether probable cause had been established _prior_ to Duke entering the vehicle.  Deputy Malcom's assertion about "probable cause and/or reasonable suspicion" is therefore improper because those two standards are not interchangeable.  Since probable cause is at issue, the court will apply that standard when looking at the evidence Deputy Malcom proffers.  Specifically, Deputy Malcom attests he saw the following:

> a single key was in the ignition rather than a key ring with several keys, they were traveling with a dog which is often believed by drug runners to mask the scent of drug odors, the time that they were traveling began [at] midnight, air freshener by the center console, inconsistent travel plans of passengers, a Jesus license plate bracket, relationship of children, body language, and lying to an officer or story not rehearsed.

_Id._ ¶ 18.

Yet, Deputy Malcom also attested that prior to arriving on the scene, he had no "significant information about the situation from dispatch or anyone else." *Id.* ¶ 11.  Moreover, once he arrived on the scene, he did not converse with the plaintiffs prior to deploying Duke.  *Id.* ¶ 16.  Since Trooper Bairett never informed Deputy Malcom about the single key in the ignition or the time of travel, the court questions how Deputy Malcom could have had this information before Duke entered the vehicle.  Certainly the dash cam video provides no support that Deputy Malcom garnered this information before Duke entered the vehicle.[7]

Deputy Malcom's recitation of the facts does raise an issue about horizontal collective knowledge.  It is therefore necessary to address this issue as well.  Horizontal collective knowledge exists "where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." *Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (citation omitted).  Under "such situations, the court must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." *Id.* (citation

---

[7] What the dash cam video does support is that some of Deputy Malcom's attestations do not match what was stated on scene.  For example, when Duke focused on the center console, Deputy Malcom told the other officers he took a bag of "jerky out just to make sure that wasn't what he was hitting on or–you know, maybe–."  Video Tr., 47:17–20.  In his affidavit, Deputy Malcom changed this to, "I removed a bag of beef jerky that was near the center console to prevent Duke from putting his nose in the Plaintiffs' food and spoiling it.  I did not think or believe that Duke would 'alert' to beef jerky.  In fact he is trained not to give an alert or indication to any type of food."  Aff'd of Jeff Malcom, ¶ 22 (Jan. 14, 2011) (Dkt. No. 115).  The latter statement changes the motivation for why Deputy Malcom acted.  Although the beef jerky, in itself, is not relevant to the court's probable cause analysis, a fact finder may question the credibility of Deputy Malcom's two affidavits.  Perhaps, like the plaintiffs, there may be a reasonable explanation for the inconsistencies, but the court will leave such a determination to the fact finder.

omitted).

The record does not disclose that the single key in the ignition or the midnight travel were acknowledged or communicated prior to Duke entering the vehicle. All other factors, except the presence of a dog in the vehicle, were already addressed above by the court and found lacking to establish probable cause. The presence of the Chihuahua does not alter the court's conclusion. Thus, the court concludes Deputy Malcom also lacked probable cause under the horizontal collective knowledge doctrine.

        iii.    *Good Faith Defense*

Next, Deputy Malcom asserts he has a good faith defense. This defense arises when an officer relies upon the collective knowledge doctrine to search a vehicle, but later learns that the instructing officer lacked probable cause to order the search. *United States v. Hensley*, 469 U.S. 221, 232 (1985). Under such circumstances, the second officer "may have a good-faith defense to any civil suit," if the officer shows he reasonably relied upon the information provided to him. *Id.* at 232–33. Reasonable reliance is an objective standard. *See Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997) (stating "[t]he relevant question is whether it was objectively reasonable for [an officer] to believe, on the basis of the statements, that probable cause existed"). If an officer's actions were not objectively reasonable, then qualified immunity provides no protection. *Id.* at 456.

Here, it is undisputed that Trooper Bairett did inform Deputy Malcom that he thought there was probable cause to search the vehicle. Trooper Bairett made this statement, however, after telling Deputy Malcom the facts upon which he was basing his conclusion. Thus, Deputy Malcom was in a position to judge for himself whether there was probable cause to search the vehicle. Relying on

another officer's conclusion under such circumstances is not reasonable.  Moreover, Deputy Malcom

stated in his affidavit that even though Trooper Bairett told him there was probable cause, Deputy

Malcom "proceeded with the dog sniff as [he] would for an investigative stop based upon reasonable

suspicion."  Aff'd of Jeff Malcom, ¶ 15 (Jan. 14, 2011) (Dkt. No. 115).  If such was the case, then

even Deputy Malcom's actions show he did not rely upon Trooper Bairett's statement.  The court

therefore concludes Deputy Malcom has failed to come forward with sufficient evidence to show he

reasonably relied upon the information provided to him.  Accordingly, he is not entitled to qualified

immunity based on a good faith defense.

iv.   <u>*Facilitating Duke's Entry into the Vehicle*</u>

Deputy Malcom states in an affidavit that even though Trooper Bairett said he would keep

the passenger door open, he did not hear this statement.  Therefore, he contends he should not be

liable for facilitating Duke's entry into the vehicle.  According to the dash cam video, the following

exchange occurred between Trooper Bairett and Deputy Malcom:

| | |
|---|---|
| Malcom: | Yeah, just pull the two kids out of the car (inaudible). |
| Trooper Bairett: | Yeah, that's what I was planning on doing.  When they get out of the car, I'll leave the doors open. |

Video Tr., 44:14–18.  There was no response from Deputy Malcom to this statement.  Deputy

Malcom contends that he had already turned to walk back and get Duke.  Due to the traffic noise,

he could not hear what was said and he did not observe Trooper Bairett opening any doors or taking

action to keep them open.  Reply Aff'd of Jeff Malcom, ¶ 8 (Mar. 11, 2011) (Dkt. No. 130). This

may be true, but it is for the jury to weigh the credibility of Deputy Malcom against the evidence

-21-

from the dash cam video.  Because a material fact is in dispute, Deputy Malcom is not entitled to

summary judgment on this issue.

       v.     *Duke's Purported Alert*

Deputy Malcom further contends that Duke's entry into the vehicle was proper because he

alerted before entering the vehicle.  In a case similar to this one, an officer stopped a driver for a

traffic violation.  After he became suspicious that the vehicle's occupants were involved in illegal

activity, he ran his drug dog around the exterior of the vehicle.  The officer "testified that the dog's

body stiffened and his breathing became deeper and more rapid, signaling that he had discovered an

odor he was trained to detect." *United States v. Parada*, 577 F.3d 1275, 1279 (10th Cir. 2009).  The

dog then "tried to jump in the window, but [the officer] pulled him off before he succeeded." *Id.*

The dog never "indicate[d] or pinpoint[ed] the source of the odor." *Id.*  The defendant argued that

this "general alert without a final indication is insufficient to create probable cause to search." *Id.*

at 1281.  The Tenth Circuit disagreed.  It found that the trial court had the opportunity to assess the

credibility of the officer, and therefore, judge whether an alert had occurred.  Because it found no

clear error, it concluded that probable cause to search had been established based on the dog's alert.

*Id.* at 1281–82.

Here, Deputy Malcom contends Duke "began breathing quickly and deeply," prior to jumping

into the vehicle, "which is how he acts when he alerts to a drug odor."  Aff'd of Jeff Malcom, ¶ 21

(Jan. 14, 2011) (Dkt. No. 115).  Part of his alert also purportedly consisted of Duke jumping into the

vehicle. *Id.*  Setting aside for the moment Deputy Malcom's contention that a dog jumping into a

vehicle can establish probable cause for an officer to enter the vehicle, the dash cam video creates

a material issue of fact as to whether Duke actually alerted before entering the vehicle.  The manner in which Deputy Malcom handled Duke[8] and the three seconds, a very short period of time, between deployment and entry do not readily confirm that an alert occurred.

The affidavit submitted by Deputy Malcom's expert does not aid in resolving the matter on summary judgment.  According to Mr. Nope, Duke "alerted when he lifted his head up, began breathing deeply, and jumped into the rear passenger door of the Jeep."  Aff'd of Wendell Nope, ¶ 23 (Dkt. No. 129).  Based on the dash cam video, it appears that the only time Duke lifted his head up, prior to entering the vehicle, was when he sniffed at the rear window of the vehicle.  Yet, Deputy Malcom testified that Duke did *not* alert during that period.  Because Deputy Malcom has more experience with this particular dog than Mr. Nope, it is unclear why Mr. Nope believes this constituted an alert.  To the extent Duke raised his head at some other point, it would be best for Mr. Nope to point out that nuance to a jury.  Ultimately, however, Mr. Nope can be considered only an expert in proper procedures for training and handling drug dogs.  He is not an expert in perceiving facts, nor an expert on how this particular dog reacts.  If Mr. Nope was able to hear Duke breathing deeply on the video, then so too should the jury.  Unfortunately, that sound is not evident on the video supplied to the court, so it cannot resolve this disputed issue.

Hence, as in *Parada*, the fact finder will have to judge the credibility of Deputy Malcom to

---

[8]  Mr. Nope asserts that Deputy Malcom handled Duke in conformance with established standards.  In particular, Deputy Malcom kept the leash slack so as not to cue Duke improperly. Improper cuing may occur by means other than a taut leash.  Because the dash cam video shows Deputy Malcom pulling Duke away from the rear window and keeping him in a close space between him and the vehicle as he backed towards the passenger door, a material issue of fact exists regarding whether improper cuing occurred.

resolve whether Duke alerted before entering the vehicle.[9]  In making that determination, a fact finder may consider whether Duke manifested a response that could be perceived as an alert by an objective observer.  Deputy Malcom and Mr. Nope are put on notice, however, that they will not be permitted to testify that a dog's jump into a vehicle constitutes an alert.  Probable cause must be established *before* entry, not by an entry.[10]

## C.  First Prong Established to Defeat Qualified Immunity

As stated above, "[w]hen a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (quotations and citations omitted).  The plaintiffs have established the Trooper Bairett facilitated Duke's entry into the vehicle.  Material issues of fact exist as to whether Deputy Malcom also did so.  Nevertheless, if Duke alerted prior to entering into the vehicle, then even if the officers facilitated his entry, probable cause would have been established prior to this violation.  Material facts, however, are also in dispute on this issue.  The plaintiffs have therefore come forward with

---

[9]  Deputy Malcom has moved to strike the report submitted by the plaintiffs' expert in their summary judgment briefing.  The report addresses Deputy Malcom's handling of Duke and opines that Duke was handled improperly.  Because the court does not rely on the report in this decision, it denies as moot the motion to strike.  (Dkt. No. 127.)  It also denies as moot Deputy Malcom's motion to compel the deposition of the plaintiffs' expert.  (Dkt. No. 140.)  The court makes no decision as to whether the plaintiffs' expert is qualified to testify at trial and whether his proffered opinions are admissible evidence.  Such issues may be handled through a *Daubert* motion if the plaintiffs intend to offer this witness at trial.

[10]  An exception to this may exist if a dog spontaneously enters a vehicle without encouragement from an officer.  Since that is not the case here, testimony will not be permitted that part of the alert was Duke entering into the vehicle.

sufficient evidence to show their constitutional right to be free from an unreasonable search may have been violated.  Consequently, the plaintiffs have met their burden on the first prong.  The court now turns to the second prong.

## IV.   WELL ESTABLISHED CONSTITUTIONAL RIGHT

To defeat qualified immunity, the plaintiffs must further show that the constitutional right at issue was clearly established at the time of the violation.  Typically, "for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Morris*, 672 F.3d at 1196 (quotations and citation omitted).  The law must be such that a reasonable officer would know "his conduct was unlawful in the situation he confronted."  *Id.* (quotations and citation omitted).  Nevertheless, because prior precedent rarely will involve "exactly the same circumstances," the Tenth Circuit has "adopted a sliding scale" for this analysis.  *Id.* (quotations and citation omitted).  "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  *Id.* (quotations and citation omitted).

Finally, "[t]he question of whether a right is clearly established must be answered in light of the specific context of the case, not as a broad general proposition."  *Id.* (quotations and citation omitted).  In this case, the broad general proposition is that of improper search.  The specific context is whether the law was clearly established that an improper search occurs if an officer facilitates a drug dog's entry into a vehicle before probable cause has been established.  The incident at issue occurred on November 20, 2008.  There court therefore looks at decisions published before this date.

In 1989, the Tenth Circuit issued *United States v. Stone,* 866 F.2d 359 (10th Cir. 1989).  In that case, the driver lifted the vehicle's hatchback to retrieve an item.  The hatchback remained open at the time a trained drug dog was deployed off leash to sniff the vehicle.  When the dog reached the back of the vehicle, he spontaneously leapt into the vehicle through the hatchback.  The Tenth Circuit stated this "created a troubling issue under the Fourth Amendment" because "[p]eople have a reasonable expectation of privacy in the interiors of their automobiles; police may not search an automobile unless they have probable cause to believe it contains contraband."  *Id.* at 363 (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 269–70 (1973)).  Nevertheless, it concluded that the Fourth Amendment had not been violated because the  dog's actions were instinctive.  *Id.* at 364. Moreover, there was no evidence that the officer had opened the hatchback or encouraged the dog to enter.  *Id.*

In 1998, the Tenth Circuit issued *Winningham*.  As discussed above, in *Winningham*, a drug dog entered into a van after an officer had opened the door of the vehicle.  Relying on *Stone*, the government contended the search was proper because the dog had spontaneously entered into the vehicle.  The Tenth Circuit disagreed for two reasons.  First, *Stone* focused on what the officer did not do, namely, he did not open any of vehicle's doors or encourage entry into the vehicle. *Winningham*, 140 F.3d at 1330–31.  Second,  in *Stone*, the officer had reasonable suspicion and the range of acceptable activity therefore differed from what would have been allowed in the absence of reasonable suspicion.  *Id.* at 1331.  In contrast, the officer in *Winningham* did open the vehicle's door and all reasonable suspicion had been exhausted prior to the dog sniff.  Consequently, the Court concluded the dog's entry into the vehicle constituted an improper search.  *Id.*; *see also United States*

*v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008) (stating "If Hubert and his dog entered the trailer before they obtained consent from Forbes or established probable cause, their actions may well have violated Forbes' Fourth Amendment rights").

Another Tenth Circuit case issued before Ms. Felders was stopped also supports that the relevant inquiry is whether the dog's actions were instinctual or facilitated by an officer. *See Kokinda v. Peterson*, 245 Fed. Appx. 751, 756 (10th Cir. 2007) (concluding "the Fourth Amendment is not implicated when a drug detection dog jumps into a suspect's vehicle during a traffic stop if the dog's actions were instinctual" and because "there was no evidence in the record that the dog handler did anything to encourage the dog to jump through the open window" there was no illegal search) (alteration omitted).

While it is unlikely to find precedent exactly matching the present case, the court concludes existing precedent was sufficient to put Trooper Bairett and Deputy Malcom on notice that facilitating a drug dog's entry into a vehicle can constitute an illegal search. Moreover, the facts show that Trooper Bairett intentionally orchestrated a situation where a drug dog would intrude into the privacy of Ms. Felders' vehicle and that Deputy Malcom may have participated as well. Because of the seriousness of these actions, prior case law does not require the same degree of specificity as would be necessary absent such deliberate actions. The plaintiffs have therefore met their burden and the court hereby denies qualified immunity to Trooper Bairett and Deputy Malcom on this cause of action.

## V.     RACIAL PROFILING

The plaintiffs further assert that Trooper Bairett violated the Equal Protection Clause because

he engaged in racial profiling. "The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1166 (10th Cir. 2003) (quotations and citation omitted). Thus, "claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and . . . the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

To avoid interference with proper law enforcement, however, the standard for proving racial profiling "'is a demanding one.'" *Id.* at 1167 (quoting *U.S. v. Armstrong*, 517 U.S. 456, 463 (1996)). The plaintiffs must prove that Trooper Bairett's actions were (1) motivated by a discriminatory purpose, and (2) had a discriminatory effect. *Id.* at 1168 (citing *Armstrong*, 517 U.S. at 465). "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Id.* (citation omitted). A presumption exists that when an officer conducts a traffic stop, he has not violated Equal Protection rights. *Id.* at 1167. In order to dispel this presumption, a plaintiff must present "clear evidence to the contrary." *Id.* (quotations and citation omitted).

Here, the plaintiffs contend that the extension of the traffic stop was necessarily motivated by race because (1) Trooper Bairett admitted he had no articulable suspicion of criminal activity when he had Ms. Felders step out of the vehicle so he could question her further, (2) he allegedly exaggerated and misstated the basis for the detention and search while speaking to his colleagues, and (3) he allegedly mocked Ms. Felders' "African-American accent."

Even viewing these facts and drawing all inferences therefrom in the light most favorable to the plaintiffs, summary judgment in favor Trooper Bairett on this claim is appropriate because the plaintiffs have failed to present "clear evidence" to rebut the presumption that Trooper Bairett did not violate the plaintiffs' Equal Protection rights.  Officers commonly continue questioning a driver after returning one's documents based on a mere hunch rather than reasonable suspicion.  They do so by consent of the driver, as occurred in this case.  Additionally, even if Trooper Bairett did exaggerate facts, this does not provide clear evidence that Trooper Bairett exaggerated facts for a discriminatory purpose.  Finally, with respect to the mocking tone, it is clear from the dash cam video that Trooper Bairett did mock Ms. Felders' tone.  What is not clear, however, is that he was mocking an "African-American" accent rather than simply a woman's voice.  While the court does not condone this action, it falls short of the demanding standard required to prove racial profiling. Moreover, the plaintiffs have come forward with no evidence to show Trooper Bairett disproportionally detains and searches vehicles driven by African-Americans following a routine traffic stop.  The court therefore concludes that the plaintiffs have failed to meet their burden of proof.  Accordingly, the court grants summary judgment in favor of Trooper Bairett on this claim.

## CONCLUSION

For the reasons discussed above, the court GRANTS IN PART and DENIES IN PART Trooper Bairett's summary judgment motion.[11]  It GRANTS summary judgment in favor of Trooper Bairett on the plaintiffs' improper seizure and equal protection claims.  It DENIES summary judgment on the plaintiffs' improper search claim against Trooper Bairett because the court

---

[11]  Dkt. No. 79.

concludes he facilitated Duke's entry into the vehicle and other material facts are in dispute.

The court DENIES Deputy Malcom's motion for summary judgment because material facts are in dispute.[12]

The court also DENIES AS MOOT Deputy Malcom's motion to strike the report of the plaintiffs' expert[13] and the motion to compel the deposition of plaintiffs' expert.[14]

The court DENIES the plaintiffs' motion for summary judgment.[15]

Finally, the court DENIES AS MOOT Trooper Bairett's motion to strike the plaintiffs' response to his notice of supplemental authority[16] because the court did not rely upon any argument contained in the notice.

DATED this 6th day of August, 2012.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[12]  Dkt. No. 113.

[13]  Dkt. No. 127.

[14]  Dkt. No. 140.

[15]  Dkt. No. 85.

[16]  Dkt. No. 150.